Good morning. May it please the Court. My name is Ken Friedman. I'm one of the attorneys for Katherine Nixon in this case. As you probably know, Ms. Nixon was a nurse at a hospital operated by the defendant, FHS. She alleges while at work, a doctor who had privileges at that hospital, inappropriately and intentionally and unwelcomely touched her buttocks while she was at work. Is that all it was, just the mere touching? Yes. I'm not belittling that, but groping was used somewhere. Well, she is used. The question is how aggressive was it? Right. She describes it as a sexual, that it felt like a sexual encounter to her that it was, that he brushed his hand along the entire width of her body as he walked by her. And it didn't seem to her to be inadvertent, and of course for summary judgment purposes. No, I understand the rules. I just was asking what the record reflected. Yes. Thank you. And I think the question raises a good point because without a kind of a clear standard, district courts are going to be asked to evaluate those kinds of questions. How long was it? How much force was applied? What parts of the body were touched? And what we're going to be arguing today is that there should be a clear standard, and it's the EEOC standard that's cited in the Brooks opinion from the policy guide. It's in footnote 8 of the Brooks opinion. The commission will presume that the unwelcomed intentional touching of a charging body's intimate body areas is sufficiently offensive to alter the conditions of the work environment and constitute a violation of Title VII. That is the EEOC test in their policy guide. It's on the website. That's what employers are told. The Ninth Circuit, this court, has noted that in the Brooks opinion. And if you look at the Ellison opinion, Ellison v. Brady, the court there said, we begin our analysis of the third part of the framework we set forth in Jordan with a closer look at Meritor, which is the Supreme Court case. The Supreme Court and Meritor explain that courts may properly look to guidelines issued by the So there are several general principles I don't think are in dispute. A single incident of severe abuse can constitute a hostile work environment, and there certainly are some instances that are a matter of law, that as a matter of law would not constitute a hostile work environment. The courts are careful to say that the Title VII is not a civility test. Jokes and even inappropriate images, even inappropriate comments, don't always rise to the level that would be a Title VII violation. But how do you distinguish the facts in Brooks? How do they compare to what happened here? Well, they both involve the intimate and unwelcome and intentional touching of a private part. I don't think you can read Brooks literally to mean that the touching of Ms. Brooks' breast while she was on a 911 call would not constitute a severe incident enough to trigger Title VII. You have to read Brooks in conjunction with what happened, which is they immediately removed that person from the workplace and eventually terminated him. And the reason is explained in Brooks. Only the employer can change the terms and conditions of the employment. An isolated incident of harassment by a co-worker will rarely, if ever, give rise to reasonable fear that sexual harassment has become a permanent feature of the employment relationship. And they go on to say, by hypothesis, the employer would have no advance notice and therefore could not have sanctioned the harassment beforehand. That's the same we have here. And if the employer takes appropriate corrective action, it will not have ratified the conduct. So is that your main distinction from Brooks? Are you saying that the hospital here didn't take immediate corrective action? They did not take. Because the action in Brooks, if I recall, is it was a single incident in which a co-worker touched the plane of stomach, fondled her breast and propositioned her sexually. And that did not, you know, constitute or rise to an actionable sexual harassment. So I'm trying to figure out how your situation here, your client, and then what do you think, I mean, it seems lesser than what happened in Brooks. And what did the hospital not do that you think should have done in this case? Well, we lay out several things. But I think the most important one is at the end of their investigation, that was an inconclusive result, which means to them it may have happened, it may not have happened. They took no action. They told Ms. Nixon, you have to come back to work with no guarantees that we will do anything to prevent it from happening again. So a jury could find that that was insufficient under the standard. And that is the crucial distinction between Brooks. In Brooks, they immediately removed the harasser. Well, what were they supposed to do with an inconclusive determination? Well, that, we would argue, is a jury question, what they're supposed to do. They're supposed to do something that's reasonable under the circumstances. They have options. They could talk to him. They could warn him. They could put him on probation. They could put her on a different. But if it's inconclusive, they're finding that the claim hasn't been proved to them. Do you say that they should take action when the claim hasn't been proved to them? Yes. On the allegation, they should credit the complaint of the plaintiff sufficiently to take action against the accused person, some action. Suppose they don't believe Ms. Nixon. Well, inconclusive is a term of art. They didn't find it to be not established, and they didn't disprove her allegation. They had her allegation. They had his denial. That's why it was inconclusive. So they don't have to take action against the doctor. They have to take some action to protect Ms. Nixon. Well, didn't they do that here? I mean, even though it was inconclusive, it seems like the hospital made an effort to talk to her, to tell her as soon as they could, realizing that she was out, not knowing what the reason why she was out, that they would do wanting to talk to her to figure out a solution and then possibly having her be moved somewhere else if she felt uncomfortable. Well, they did some things right. They started an investigation promptly. They interviewed witnesses. They did some things right. But at the end of the day, when her attorney wrote and said she was willing to come back to work if you show us the results of your investigation and you tell us what you have done to protect her in the future from another incident. Remember, for purposes of summary judgment, it is presumed that this event happened as she explained it, as she alleged it to happen. Therefore, their actions, the questions the court is raising, are questions that are appropriately fleshed out in front of a jury. If the standard for summary judgment is usually. . . Counsel, what is the jury going to be looking at? You're saying that they did a prompt and adequate investigation at the front end. Now, under Swenson, it breaks it down into two categories, the preliminary reaction, and you're suggesting that what they did initially was fine. But at the end of the day, as you say, which is the permanent resolution, the jury would be looking at what? Well, there's a Ninth Circuit pattern instruction that says, did they take sufficient actions to prevent this from happening again? This being what? The physical contact between. . . The presumed physical contact. Correct. Okay, which has not been corroborated. Right. And it's just her state of mind. And she's gone off work. Correct. And she's reacted quite strongly and has then declined to come back. So where is the. . . What is the jury hanging its hat on to say that they should have taken steps at the end of the day to separate them? And that's where, as we pointed out in our brief, there's a conflict between the expert opinion in this case. Ms. Nixon's expert said it was an unreasonable conclusion to their investigation. Even their own expert said if it's inconclusive, you should do something. Yes. And so that something is a question for the jury to decide. But when should they have done something? Because as I understand it, she took off. . . Right. . . . for reasons that initially were not identified as being triggered by this incident. And so when did they get to the point where they were confronted with the need to do something physically? That is when Mr. Vandenberg wrote a letter on her behalf saying she wants to come back to work, but she needs assurances that she will be protected. And that something could be she can work on the eighth floor instead of the ninth floor, or we talked to the doctor and warned him. It could be a wide range of things, but they have to do something. And what we have here is they told her you need to come back to work or we will replace you. So I'm out of time, so I will stop there. But I think if you look at the EEOC guidelines, they had. . . Well, that goes to definition. Are you talking about the remedial aspect? Two things. First, the EEOC guideline that what makes this single incident different than other single incidents is it was an unwanted. . . I got that. And second, the guidelines are you must take remedial action sufficient to prevent it from happening again. And for purposes of summary judgment, it's presumed to have happened, and the district court should allow a jury to hash out the questions that I think the court is properly concerned with. Thank you. Thank you very much. Good morning. May it please the Court, I'm Karen Jones, appearing on behalf of Franciscan Health System, or FHS, and we would like to reserve three minutes of appellee's argument time for counsel for Dr. Mia to present argument. Keep an eye on the clock. I will. Thank you, Your Honor. Ms. Nixon has taken what is at its core a very simple case that's easily resolved under the clear law of this circuit, and she's attempting to craft new law that would be directly contrary to that clear authority. The crux of Ms. Nixon's case involves an erroneous conflation of two separate issues, and this is how she is trying to distinguish the Brooks decision today. The first is the issue of whether conduct prohibited by Title VII in the Washington law against discrimination has actually occurred, and the second issue is if such conduct has occurred, whether the employer can be held liable for that conduct. Ms. Nixon inappropriately jumps directly to the issue of employer liability. She's attempting to ignore the first issue of whether actionable harassment has even actually occurred. You're suggesting that a woman whose buttocks had a doctor's hand dragged around her isn't something that triggers an employer's duty to investigate? It may trigger a general moral duty to look into it. Moral duty? Under Swenson, I think that the unwanted touching in a workplace by a doctor who's superior to a nurse doesn't require her to prove hostile work environment beyond there's been the kind of unwanted sexual touching, and the employer has to do something about it. Your Honor, that's not what Brooks has said. That's what Swenson says. Swenson, Your Honor, talks about a situation where there was pervasive harassment going on, which was, in that case, potentially a hostile work environment, and that would trigger. You don't think it's a hostile work environment for a nurse to be fondled by a doctor? I certainly think it's inappropriate, clearly, Your Honor. Is it enough to constitute a hostile work environment? No, it might not be a hostile work environment at the end, but it does trigger a duty because if the employer doesn't protect an employee from that kind of unwanted touching, it does become a hostile work environment. Wouldn't you agree with that? You bring up a very good point, Your Honor. Thank you. That is, if the employer doesn't act, and if a second or a third or fourth incident occurred, it could very well add up to a hostile work environment. That's absolutely correct. And so in that sense, the employer does have an obligation. If that second act occurred, could the employer be held liable for negligently failing to act? Absolutely. That's true. That did not occur here. There was only the single ledge touching, as Ms. Nixon has admitted, the running of the hands across her buttocks as Dr. Mia walked by. There's only that single touching. And under Brooks and its progeny, that in and of itself is not enough to constitute a hostile work environment. I think you're missing the point. They're not saying that that single touching was a hostile work environment all by itself. It was if the employer doesn't take some kind of action to investigate and to separate the complainant from the alleged offender, then that itself can become a hostile working environment. That's the generalization. Now, whether that is met here, but it isn't the employee, you know, the aggressor who's by himself creating the hostile work environment. It's when the employer doesn't do anything about it. Then that's a separate hostile work environment. That's true, Your Honor. There is that two-step analysis where first you would look at the harasser's conduct and then you would look to the employer's conduct in responding to that harasser's conduct. So there are those two steps. And what's problematic here is that the harasser's conduct did not, as this case is structured, add up to a hostile work environment. Would you want to go to a jury on step one and say to the jury that this wasn't a serious sexual unwanted touching and let the jury decide that? Your Honor, I don't think it needs to get there because there's something else to be defined. Would you like it if it did? I wouldn't want to have your side of the case. But in any event, can you address then the second phase, which is what counsel seems to be. Certainly, Your Honor. Yes, we can shift to the investigation. In this case, FHS's response to Ms. Nixon's complaint was entirely appropriate and legally adequate. Ms. Nixon has acknowledged that the investigation was started promptly, that the initial part of the investigation was certainly legally adequate, even in her eyes. And the many steps taken by FHS during the investigation, those have been outlined in the briefing and in the record, in particular the declarations in the record, which talk about the many steps taken, not only in interviewing Ms. Nixon and, of course, speaking with Dr. Mia about the situation, but also interviewing the other. Do you agree with your learned friend that once the decision is made, the investigation of whether the act occurred was inconclusive, that triggers some requirement for some action against the doctor? No, I do not agree with that. Why not? Well, Your Honor, as Swenson has held, there's no obligation to discipline an employee where there's been no corroboration of the accused employee's conduct. That would trigger, that would really catch an employer between a rock and a hard place. They would be caught between needing to comply with Title VII's obligations and then needing to not wrongfully discharge the accused employee, for example. Well, whether there was corroboration or not, isn't that a jury issue? No, Your Honor. No, here it's undisputed that nobody else saw this happen. Ms. Nixon herself did not even see his hand touch her buttocks. She felt something brush against her as he walked by. Nobody else had ever witnessed any behavior by Dr. Mia along the lines of this. No other supervisors, no other RNs, and they spoke to a wide range of people about that and there was no corroboration that this had occurred. And, of course, Dr. Mia has always adamantly denied that he engaged in this conduct. And, Your Honors, if I may, I see I'm down to three minutes, and if I may turn it over to counsel for Dr. Mia. Appreciate that. Thank you very much. Good morning. My name is Bertha Fischer. I'm here on behalf of Dr. Mia. I want to address Judge Fischer's point first. Do you want to take it to a jury? Dr. Mia certainly does want to take it to a jury. That's what this has been about from our standpoint from the beginning. Dr. Mia has been accused, and let's make clear, Dr. Mia is not an employee of Franciscan Health Services. He is an independent doctor who had privileges to attend to his patients. And this gets to the court's other question. What was reasonable? Is it reasonable on an allegation, a single allegation of misconduct, uncooperated, to ban Dr. Mia from attending to his patients? And the answer to that is no. I think the question then, I take your point, is the remedy only that he be banned, or was there the, as Swenson talks about, a way to achieve separation so she wasn't working in the proximity? She wound up, as I noted, she's back working for the hospital, but at a different facility. And, Your Honor, again, because I represent Dr. Mia, I don't want to establish all of that. I want to address it from Dr. Mia's standpoint. I understand. Was he threatened? Is it your understanding that the plaintiff is looking to have him banned from the hospital? I understand that that is essentially what they wanted, that they wanted an assurance that he would not be at the hospital, and that's unreasonable. You have to understand that Dr. Mia was, in fact, brought in, talked to immediately, talked to several times, and told, presented with their policy and told it would not be tolerated in no uncertain terms. That, in and of itself, is corrective action. You're taking, acting pursuant to your duty to make sure it doesn't happen again. It never happened before. We say it didn't happen this time, but you can't do that on summary judgment. And it never happened after. What do we do with the allegation that the doctor took unwanted pictures of another person? That's not an allegation. That is not an allegation that raises hostile work environment, because the testimony of that particular person was that it did not bother her. It was simply a cell phone photo. It was nothing, it was not an excusable word, a boob shot or anything like that. It was simply a photograph testing his new phone. And again, when that was part of their investigation, and those things were stressed. This is how we expect you to act. The final point that I want to bring up, we've asked the court to decline supplemental jurisdiction. The court did that. We think that this is appropriately tried between Dr. Meehan and Kathy Nixon in a State court. Thank you. We'll give you a minute to rebuttal. Thank you. I just, I think, have one point to make, which is it's not incumbent on an inconclusive investigation to discipline or ban Dr. Meehan from the hospital. But it is incumbent on the hospital to do something. And this is from the record at 132, which is the deposition of the human resources expert on behalf of Franciscan Hospital. And she was asked, would you agree with the statement that if no determination can be made in a sexual harassment investigation because the evidence is inconclusive, the employer should still undertake further preventative measures such as training and monitoring? Would you agree with that statement? Answer, generally, yes. So we're not saying from an inconclusive investigation you have to discipline, but you have to do something. And their expert agreed with that, and to the extent there's a factual dispute. I don't think that the talking to Dr. Meehan and explaining the policy of the hospital is doing something. Well, you have to tell Ms. Nixon you did that. And as I understand the record. She knows that now, doesn't she? She probably knows it now. As I understand the record, he wasn't told do not harass Ms. Nixon. He was told do not retaliate, which is a separate issue. I didn't see anything in the record where he was told that he was going to be watched, monitored on probation. He wasn't given any training. So I think the record is devoid of any evidence that they took enough for summary judgment. Certainly they have arguments they can make to a jury, but I don't think they get summary judgment on these facts. Thank you very much. The case of Nixon v. Francisco Health System is submitted.
judges: Fisher, Bea, Murguia